UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

GLORIA BUSH,

      Defendant.

_____/

Case No. 5:21-cr-20272
District Judge Judith E. Levy
Magistrate Judge Kimberly G. Altman

## REPORT AND RECOMMENDATION TO DENY DEFENDANT'S MOTION TO SUPPRESS (ECF No. 34)

### I.    Introduction

This is a criminal case.  Defendant Gloria Bush (Bush) has been indicted for assault of a federal officer under 18 U.S.C. §§ 111(a)(1), (b) and use and carry of a firearm in relation to a crime of violence 18 U.S.C. § 924(c).  She now moves to suppress inculpatory oral and written statements she made to law enforcement officers during a custodial interview shortly after her arrest.  (ECF No. 34).  As will be explained, Bush contends that she did not waive her *Miranda* rights voluntarily, knowingly, and intelligently.  (*Id.*).

Under 28 U.S.C. § 636(b)(1)(B), Bush's motion to suppress has been referred to the undersigned.  (ECF No. 35).  The government has filed a response, (ECF No. 42), along with a video recording of the custodial interview.  An in-

1

person hearing was held on February 24, 2023.  For the reasons that follow, the undersigned RECOMMENDS that Bush's motion be DENIED.

## II.    Background

### A.    The Arrest

According to the affidavit of Federal Bureau of Investigations (FBI) Special Agent Emily Munchiando (Agent Munchiando), on the morning of April 7, 2021, a Drug Enforcement Agency Special Response Team (DEA-SRT) and a Michigan State Police (MSP) trooper executed a search warrant on a residence in Detroit, Michigan.  (ECF No. 1, PageID.3).  The MSP trooper turned on her vehicle's emergency lights and began repeatedly stating " 'police, search warrant' " over the vehicle's loudspeaker.  (*Id*.).  At the same time, DEA-SRT members approached the residence's front door.  (*Id*.).  They knocked and shouted, " 'police, search warrant.' "  (*Id*.).

Within seconds, two shots were fired from inside the residence toward the DEA-SRT.  (*Id*., PageID.3-4).  A bullet struck a DEA-SRT member's shield.  (*Id*., PageID.4).  The DEA-SRT then retreated from the front door of the residence and took cover.  (*Id*.).

After the DEA-SRT took cover, the MSP trooper repeatedly demanded over the course of several minutes for the occupants of the residence to come outside.  (*Id*.).  After about an hour, two individuals exited the residence and were arrested.

2

(*Id*.).  Bush was one of the two individuals.  (*Id*.).  A pistol, a rifle, and ammunition casings were later found during a search of the residence.  (*Id*., PageID.4-5).

## B.    Evidentiary Record

The record evidence in this matter consists of a video recording of Bush's custodial interview along with Bush's written statement and hearing testimony from Agent Munchiando and Bush.

### 1.    Video Recording

After her arrest, Bush was taken to Detroit Safety Headquarters to be interviewed.  (ECF No. 1, PageID.5).  She was placed alone in a room until law enforcement officers were ready to question her.[1]

Shortly after being placed in the room, an unknown female officer entered, and asked Bush if she wanted anything.  (00:00:03).  Bush asked for water and the officer returned with a water bottle and tipped the bottle so Bush could drink.  Bush thanked the officer.  (00:01:24).  Bush then sat quietly in a chair without incident.

After about a half an hour, Bush knocked on the door of the room in which she was being held.  (00:31:53).  The unknown female officer entered, and Bush asked to be charged and complained about the pain being handcuffed was causing

---

[1] The government submitted a video recording of Bush's time at the Detroit Safety Headquarters as Exhibit A to its response to the instant motion.  Citations to the recording will be in the format of HOUR:MINUTE:SECOND.

3

her arms.  The officer spoke to Bush briefly and then left to find out more information.  Bush also told the officer that she had been like this since 6:00 a.m. (00:32:21).

A few minutes later, the female officer returned, accompanied by an unnamed man.  (00:35:04).  The officer uncuffed Bush while the man tried to calm Bush down.  Bush was visibly upset and asking to be charged.  The man tried to swab Bush's hands for gunshot residue, but she resisted and became combative. Another woman entered the room and attempted to explain the situation to Bush. All the while, Bush repeatedly demanded to know why she had been arrested.  The woman told Bush that they were waiting on other law enforcement officers who wanted to talk to her.  Bush continued to demand to know why she was there.  At one point, she said that she would rather have the handcuffs put back on rather than be swabbed.

Bush, still upset, expressed that her blood pressure was high and that she had recently been in the hospital.  (00:37:32).  She told the three individuals that she was "about to have a f***ing stroke in this b***h, bro!"  (00:37:42)

The female officer explained to Bush that she had been arrested in relation to a shooting where law enforcement officers, including herself, had been shot at. (00:38:19).  The man then said, "We're just trying to find out if you fired a handgun."  (0038:32).  He explained that he needed to swab Bush's hand for

4

gunshot residue, and Bush complied.  After the swab was completed, all three individuals left the room, leaving Bush alone.  They said that they understood Bush was stressed and asked her to relax.  (00:40:00).  The female officer also offered to get Bush tissues, which Bush declined.  (00:40:40).

For approximately the next 20 minutes, Bush sat quietly and calmly in a corner of the room before two new law enforcement officers entered the room. (00:58:36).  One of the law enforcement officers was MSP Sergeant Christopher Clark (Sergeant Clark) who went on to interview Bush.  The other officer was Agent Munchiando.

After entering the room, Sergeant Clark offered Bush food and pop.  Bush rejected the offer and said that she wanted to go home.  Sergeant Clark then explained that he was going to ask Bush some questions and he wanted her to answer honestly.  He emphasized that he wanted to hear what happened and that he understood she had just experienced a traumatic event.

To begin the interview, Sergeant Clark asked questions covering basic information about Bush like her full name, date of birth, email address, home address and who lives with her.  (01:00:30).  Bush was calm and the tone was conversational.

A few minutes later, Sergeant Clark transitioned the subject of the interview to the morning's shooting.  (01:05:28).  Before asking any questions, Sergeant

Clark issued *Miranda* warnings to Bush.  He read the list of rights from a card while also showing the card to Bush so she could read along.

Once he was done, Sergeant Clark asked Bush if she understood her rights. She said that she did.  He then asked if she was willing to give up these rights. Bush said that she was.  Sergeant Clark also told Bush to ask him any questions she may have during the course of the interview.  (1:06:10).  Before moving on, Sergeant Clark told Bush that he wanted her to tell the truth and not agree with something that he said just because she thought it was something that he wanted to hear.

Bush explained that she had been up all-night drinking with her daughter and boyfriend.  (01:10:10).  At approximately 6 a.m.., Bush and her boyfriend had sex and then began to get ready to go to sleep.  Bush laid down on the living room floor, but before she could even fall asleep, she heard someone banging on her front door.  She got up to figure out what was going on, but then the banging became much louder, and the force of the banging began to cause the door to partially open.

Bush and her boyfriend feared that someone was trying to break into their house and that they did not think it was the police, so Bush's boyfriend grabbed her gun and shot at the front door.  They then ran upstairs.  Once there, they looked out a window and saw a police car with its lights on and heard somebody saying,

"come out," but the person speaking sounded far away.

Bush asked her boyfriend if he thought that someone who was running from the police was trying to break into their house to hide. They decided that they should call someone, so Bush's boyfriend went downstairs to grab Bush's cellphone. Once back upstairs, Bush's boyfriend called his mother and asked her to come over to talk to the police. Once his mother arrived, she spoke to the police and learned that the police wanted Bush and her boyfriend to exit their home and surrender. Bush and her boyfriend did so, and they were arrested.

Sergeant Clark asked Bush if she asked her boyfriend to shoot at the front door. (01:14:23). Bush explained that she told her boyfriend to "get the gun." Sergeant Clark then asked if Bush was telling him the truth. (01:21:30). She said that she was telling the truth and that she would be able to pass a polygraph test.

After some discussion regarding her boyfriend and the gun, Sergeant Clark asked if they could talk about what "really happened," and Bush began to get upset and cry. (01:28:20). Sergeant Clark asked if Bush knew why her boyfriend would tell him that it was Bush not him who fired the gun. Bush responded, "This is the hardest day of my life." (001:29:00). She then explained that she had been telling the truth about everything except for the fact that it was actually her who fired the gun rather than her boyfriend. (01:29:45). She shot two times toward the front door. (01:30:00). The gun was next to her when she laid down to go to sleep.

7

Bush emphasized that she did not know the people outside of her home were police officers when she fired the two shots.  Bush offered to take a polygraph test. Sergeant Clark continued to question Bush about what happened, including what she saw before she shot and when she realized it was the police.

Sergeant Clark concluded the interview by asking Bush if she needed to use the restroom of if she wanted a drink.  (01:42:00).  Bush declined.  Sergeant Clark left the room to allow Bush to write her statement by herself and without interruption.  Throughout the interview, Bush appeared calm, was able to answer all questions, and did not complain about or raise any health concerns.

About 15 minutes later, Sergeant Clark reentered the room to check on Bush's progress.  (01:56:14).  Bush informed him that she was done writing. Sergeant Clark then read Bush's statement aloud and asked her to sign and date it. The statement was consistent with her oral statements.  Sergeant Clark also mentioned trying to get her take a polygraph but did not promise it could be done that day.

A few minutes later, Bush asked to be taken to the restroom.  (01:59:52). After returning from the restroom, Bush was left alone in the room for approximately 45 minutes.  During that time, Bush was calm, sat in a chair, and rested her head on the table and may have fallen asleep for a while.  She did not ask for any assistance.

8

Sergeant Clark then returned to the room and offered Bush food.  (02:50:20).
Bush expressed that she was starved and that she would accept any type of food.
After Sergeant Clark left, Bush became emotional, started to cry, and said to
herself that she wanted to go home.  However, she quickly calmed down and rested
her head on the table again.

Sergeant Clark returned about five minutes later with orange juice, a tuna
sandwich, and Oreos.  (02:55:55).  Sergeant Clark said that they were still trying to
figure out if they could arrange a polygraph and that one might be done at 6:30
p.m.  He also told Bush to relax and take a break.  (02:56:00).  Bush again
appeared to get emotional but then calmed down.  She proceeded to lay her head
down on the table again and may have fallen asleep for a while.  After resting,
Bush sat up, ate some of the sandwich, and drank the orange juice.

About a half an hour later, two law enforcement officers entered the room
and explained that they were from North Dakota and were in Detroit for a narcotics
investigation.  (03:31:40).  One officer took the lead and asked Bush if she
remembered her *Miranda* rights, which she said that she did.  She also said that she
knew that she could ask for a lawyer at any time.  Bush agreed to talk to the
officers.

The officer explained that they came to her home that morning to execute a
federal search warrant.  He then asked her some questions about her reasons for

visiting and living in North Dakota in the past.  Soon thereafter, Bush asked for a

lawyer.  (03:37:00).  The officer stopped questioning Bush and briefly explained

that she would be held on a city warrant and that she was being charged with a

drug offense and would be appearing before a United States magistrate judge in the

coming days.

After the officers left, Bush waited in the room without incident, again

resting her head on the table.  She also walked around the room and wondered

aloud how long she would have to be in there.

About 25 minutes later, Sergeant Clark reentered the room.  (04:11:51).  He

told Bush that he did not know anything about the North Dakota investigation and

that he needed to get a buccal swab from her.  Bush asked to be taken to her final

location and then said that she had recently been in the hospital and needed to take

her medicine.  (04:13:17-4:15:30).  Sergeant Clark explained that he could have

her taken to the hospital, but that it would delay her arraignment.  (04:15:55).

Bush responded that she did not need to go to the hospital, and that what she really

needed was to take her blood pressure medication.  (04:16:11).  Sergeant Clark

said that he would look into getting medication for her and left the room.

(04:16:46).

About five minutes later, Sergeant Clark returned and asked some follow-up

questions regarding her blood pressure medication.  (04:21:40).  Bush assured him

that she would be fine if he took a few minutes to look into getting her medication, and that she did not need to be rushed to the hospital. (04:22:06). Sergeant Clark then left the room. Bush rested her head on the table and also laid back in the chair, seemingly trying to rest. She showed no signs of distress.

Less than 15 minutes later, Sergeant Clark came back to inform Bush that she needed to grab her stuff because they were going to move her to the Hamtramck police department to be housed. (04:34:51). Bush got up and left the room without incident.

### B.    Special Agent Emily Munchiando's Testimony

At the in-person hearing, Agent Munchiando testified that she is a member of the FBI's Violent Crimes Taskforce and was involved with a federal investigation into various individuals including Bush. She was not a part of the warrant execution team.

Agent Munchiando explained that after Bush was arrested, she was transported to MSP holding before being taken to Detroit Safety Headquarters. Bush arrived at Detroit Safety Headquarters around 1 p.m., and was interviewed by Sergeant Clark and Agent Munchiando around 2 p.m. Before the interview, Agent Munchiando was informed that Bush had gotten upset during the gunshot residue swabbing but had since calmed down. She was never told about Bush having any health issues like high blood pressure.

11

Before being questioned, Bush was read her *Miranda* rights and waived them.  She never asked to stop the interview and never requested an attorney.  Agent Munchiando believed that Bush's demeanor was appropriate to the subject matter being discussed and noted that she was alert, made good eye contact, and did not appear to fall asleep at any point during the interview.  Overall, Agent Munchiando believed that there was nothing at all of concern.  Agent Munchiando also noted that Bush provided coherent and truthful answers to biographical questions.

Agent Munchiando did not ask Bush if she was under the influence of any drugs or alcohol, and Bush was never given a breathalyzer test.  Bush was also not asked whether she had any physical or mental ailments or what her level of education was.

### C.    Defendant Gloria Bush's Testimony

Bush testified that she had been living with her boyfriend for about four years with about a year and a half of that time being at their current home.

She dropped out of school sometime after completing middle school.  During middle school, she was diagnosed with a learning disability and received additional educational support.

Her current medical diagnoses included depression, high blood pressure, and a condition causing water around her heart.  At the time of her arrest, Bush was

12

prescribed blood pressure medication and an antidepressant. Bush has suffered from high blood pressure for approximately 27 years and had been in the hospital a couple of days before her arrest for blood pressure related issues.

Bush was out drinking and smoking marijuana with her daughter from around 9 p.m. the night before her arrest until around 2 a.m. the day of her arrest. Right before 2 a.m., Bush stopped at a liquor store and purchased liquor that she took home and drank. Bush did not sleep at any point from 9 p.m. the day before her arrest until she was taken to Hamtramck the day of her arrest.

Bush said that she told Sergeant Clark she had been out drinking all night and that she had high blood pressure for which she needed medication. During the interview, Bush was suffering from a bad headache she attributed to elevated blood pressure. The headache felt like someone was repeatedly hitting her in the head with a hammer. She felt "foggy" during the interview and was under stress. She did not tell Sergeant Clark or Agent Munchiando about her headache or mental state. She also did not tell them that she felt dizzy or that she was going to pass out.

Despite her headache, Bush said her main focus was the interview and concentrating on the questions that she was being asked. Her headache and tiredness were in the background. Bush felt that, even though Sergeant Clark was polite, he was badgering her during the interview. Bush noted that she was

intoxicated during the interview, so she did not remember everything that happened.  Bush did remember being read her *Miranda* rights, including the right to remain silent, the right to ask for a lawyer, and the right to change her mind about remaining silent or asking for a lawyer during the questioning.

### III.    Legal Standard

"The Fifth Amendment requires law enforcement officers to advise a person of their so-called *Miranda* rights, including the right to remain silent, before interrogating them while they are 'in custody.' "  *United States v. Zabel*, 35 F.4th 493, 502 (6th Cir. 2022) (citing *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) and *Miranda v. Arizona*, 384 U.S. 436, 444-445 (1966)).  There is no dispute that Bush made the inculpatory statements at issue here when she was in custody and after being advised of her *Miranda* rights.  Instead, the dispute in this case is whether Bush voluntarily, knowingly, and intelligently waived her *Miranda* rights under the totality of the circumstances.  *United States v. Abdalla*, 972 F.3d 838, 852 (6th Cir. 2020) (citing *Garner v. Mitchell*, 557 F.3d 257, 260 (6th Cir. 2009)); *see also United States v. Musaibli*, 575 F. Supp. 3d 870, 878-879 (E.D. Mich. 2021) ("And the suspect must voluntarily, knowingly and intelligently waive these rights, or else any statements made in response to police questioning must be suppressed.") (internal quotation marks and citations omitted).

"The test for whether a *Miranda* waiver is voluntary is essentially the same

as the test for whether a confession is voluntary." *United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016) (internal quotation marks and citation omitted).  A waiver analysis "has two distinct dimensions." *Moran v. Burbine*, 475 U.S. 1135, 1141 (1986).

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id*. (internal quotation marks and citations omitted).

"For a defendant's statements during a custodial interrogation to be admissible, the government must demonstrate by a preponderance of the evidence that the defendant waived [her] *Miranda* rights prior to questioning." *United States v. Kellogg*, 306 F. App'x 916, 922 (6th Cir. 2009).

## IV.    Discussion

Bush argues that her waiver was neither voluntarily nor knowingly and intelligently made.  The Government disagrees.  Both issues will be addressed in turn below.

### A.    Voluntary Waiver

#### 1.    Standard

"There are three requirements for finding statements to be involuntary: (1)

15

the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear defendant's will; and (3) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statements." *United States v. Fein*, 843 F. App'x 765, 770 (6th Cir. 2021) (internal quotation marks and citations omitted).

In order to determine whether a defendant's will was overborne, "[r]elevant factors include the defendant's age, [her] level of education and intelligence, whether [she] was advised of [her] rights, whether [she] suffered physical punishment and the length of the questioning [she] endured." *United States v. Craft*, 495 F.3d 259, 263 (6th Cir. 2007). "These factors are viewed primarily from the perspective of the police, such that where the police had no reason to believe that the defendant misunderstood the warnings, there is no basis for invalidating the *Miranda* waiver." *Musaibli*, 575 F. Supp. 3d at 879 (cleaned up).

### 2.    Application

Here, Bush asserts that the voluntariness of her confession is in question because of the coercive effect of "her lack of sleep and / or physical distress due to her elevated blood pressure and her expressed concerns during the interview[.]" (ECF No. 34, PageID.102-103). However, as the government points out, Bush fails to explain how the police activity itself was coercive.

Nearly 40 years ago, the Supreme Court held "that coercive police activity is

a necessary predicate to the finding that a confession is not 'voluntary.' "

*Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  A few years later, the Sixth

Circuit explained that evidence of an impaired "cognitive or volitional capacity is

never, by itself, sufficient to warrant the conclusion that his confession was

involuntary for purposes of due process; some element of police coercion is always

necessary."  *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989).

The "necessary predicate" of coercive law enforcement activity is absent in

this case.  *See Connelly*, 479 U.S. at 167.  Bush does not cite facts in support of

law enforcement coercion and the video recording of Bush's custodial interview

does not show any coercion.

The interview took place in the middle of the afternoon, and the

interrogation, or questioning, portion of the interview lasted less than an hour.

During this period, Bush declined offers of food, drink, and breaks.  Additionally,

during the interrogation, Bush did not mention her high blood pressure or any other

physical ailments.  In fact, Bush did not request either medical treatment or her

blood pressure medication until a couple of hours after her interrogation ended.

And while Bush initially said that she needed to go to the hospital, when Sergeant

Clark questioned her further about her medication, she confirmed that she did not

need to go to the hospital but just needed her blood pressure medication.  Further,

although emotional at times, Bush showed no signs of distress during the

interrogation.  A review of the entirety of her interviews with Sergeant Clark and the officers from North Dakota fails to show any evidence of coercion.

Moreover, Agent Munchiando's testimony was consistent with the video recording.  Agent Munchiando testified that Bush was properly Mirandized, and that Bush never asked to stop the interview nor requested an attorney.  Agent Munchiando believed that Bush's demeanor was appropriate to the subject matter being discussed and noted that she was alert, made good eye contact, and did not appear to fall asleep at any point during the interview.  In sum, Agent Munchiando did not believe anything of concern occurred during the interview.

Bush's testimony was mostly consistent with the video recording and demonstrates that her *Miranda* rights were voluntarily waived.  She testified that even though she was suffering from an intense headache and lack of sleep during the interview, she was nonetheless able to focus on the interview and concentrate on the questions she was being asked.  She pushed her headache and sleepiness to the back of her mind.  Additionally, she described Sergeant Clark as polite, but noted that she felt he badgered her during the interview.  She also remembered being read her *Miranda* rights, including the right to remain silent, the right to ask for a lawyer, and the right to change her mind about remaining silent or asking for a lawyer during the questioning.

Neither witness's testimony suggests police coercion occurred that was

18

sufficient to overbear Bush's will.  Bush was not subjected to physical abuse and the interview only lasted for about an hour.  Even if, according to Bush, Sergeant Clark did badger her at times, he was also always polite to her.

As to her Bush's medical issues, courts in other districts have found that medical issues like high blood pressure do not necessarily render a suspect more susceptible to coercion or require a court to conclude that a waiver was involuntary.  *See United States v. Abu Ghayth*, 945 F. Supp. 2d 511, 516 (S.D.N.Y. 2013) (finding voluntariness even though the defendant's "heart rate, respiratory rate, and blood pressure were slightly elevated, at least intermittently, and his oxygen saturation level was slightly depressed"); *United States v. Medicine Horse*, No. CR–11–35–BLG–RFC, 2012 WL 1999525, at *7 (D. Mont. June 4, 2012) ("Although he had heart problems and high blood pressure, there is nothing about [the defendant's] physical or mental condition that would render him susceptible to coercion, nor is there any evidence [the interrogating officer] tried to take advantage of his physical or mental condition."); *Miller v. Cain*, No. Civ.A. CV05-0393-A, 2006 WL 3533146, at *11 (W.D. La. Oct. 18, 2006) (determining that the defendant's waiver was voluntary because he did not "allege[] any facts indicating either direct government coercion or psychological persuasion which would indicate he was coerced by the government into giving his statement[,]" even though he testified that at the time of his waiver "he was bleeding, tired, sleepy,

19

had the flu, was shaking, and his blood pressure was up"); *see also United States v. Bearden*, No. 2:10–cr–20246–JPM–cgc, 2011 WL 923489, at *3 (W.D. Tenn. Mar. 6, 2011) ("Defendant has cited no authority for the proposition that a person's medical conditions, taken alone, prevent that person from voluntarily waiving his Fifth Amendment privilege against self-incrimination.").

In sum, the government has shown by a preponderance of the evidence that Bush's waiver was voluntary, particularly because there is no evidence of the "necessary predicate" of law enforcement coercion.

### B.   Knowing and Intelligent Waiver

#### 1.   Standard

In order for a waiver to be valid, the defendant must have "possessed the level of comprehension necessary to make [her] waiver knowing and intelligent." *United States v. Abdi*, 827 F. App'x 499, 507-508 (6th Cir. 2020).  However, "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege."  *Colorado v. Spring*, 479 U.S. 564, 574 (1987).  "It simply requires 'that the suspect be fully advised' of the privilege not to be a witness against [herself]."  *Abdi*, 827 F. App'x at 507-508 (quoting *Spring*, 479 U.S. at 574).

#### 2.   Application

Here, Bush asserts that her waiver was not knowingly and intelligently made

20

because she did not understand "the severity of her situation and the legal significance of waiving her rights."  (ECF No. 34, PageID.103).  Additionally, at the hearing, defense counsel argued that for a waiver to be valid, the subject needed to sign a physical waiver of rights form.

Bush was indisputably advised of her *Miranda* rights at the beginning of the custodial interview.  She responded in the affirmative both when asked if she understood her rights and when asked if she was willing to waive her rights.

Moreover, a couple hours after the conclusion of the first interview, law enforcement officers from North Dakota entered the room to question Bush.  At that point, she reaffirmed that she understood her *Miranda* rights and noted that she could ask for an attorney at any time.  Shortly thereafter, Bush requested an attorney, and the North Dakota officers stopped questioning her and left the room.

The record evidence demonstrates that Bush was apprised of her *Miranda* rights and that she understood how to invoke them.  The law enforcement officers were under no obligation to make sure that Bush understood either the severity of the crimes of which she was accused or the potential consequences of making inculpatory statements.  *See Bearden*, 2011 WL 923493, at *5 ("The Fifth Amendment does not require further advice from law enforcement officers regarding the potential legal consequences of his abandonment of his rights.  In fact, the Sixth Circuit has cautioned that law enforcement officers should not cross

21

the line into giving legal advice because officers run a high risk when they move into the realm of offering advice regarding the potential offenses." (cleaned up)).

Finally, the undersigned is not persuaded by Bush's argument that her waiver was not knowing and intelligent because she did not sign an advice of rights form.  The Sixth Circuit considered and rejected such an argument in *United States v. Miggins*, 302 F.3d 384, 397 (6th Cir. 2002), writing, "[a]lthough [the defendant] suggests that his waiver was not knowingly, voluntarily and intelligently made because he did not sign a waiver form listing his rights, he offers no authority, and none can be found, for the proposition that a written waiver is necessary to establish a knowing, intelligent and voluntary waiver of *Miranda* rights."  One year after deciding *Miggins*, the Sixth Circuit stated that "the mere absence of a written waiver will not support the conclusion that there was no waiver."  *United States v. Johnson*, 351 F.3d 254, 263 n.3 (6th Cir. 2003) (citing *Miggins*, 302 F.3d at 397).

In the years following the Sixth Circuit's decisions in *Miggins* and *Johnson*, district courts in this circuit have rejected defendants' arguments regarding the necessity of written waivers.  *See, e.g.*, *United States v. Square*, 790 F. Supp. 2d 626, 652 (N.D. Ohio 2011) ("Despite Defense Counsel's questioning highlighting the lack of a signed form or waiver regarding Defendant's *Miranda* rights, the record in this case demonstrates adequate evidence to find that Defendant

22

knowingly, intelligently, and voluntarily waived his *Miranda* rights."); *United States v. Mayhew*, 380 F. Supp. 2d 915, 921 n.3 (S.D. Ohio 2005) ("A written waiver, however, is not a prerequisite to a valid *Miranda* waiver."); *United States v. Ramirez*, No. 3:13-CR-82-CRS, 2016 WL 11214627, at *8 (W.D. Ky. Dec. 9, 2016) ("The fact that Ramirez did not make a *written* waiver of his rights is not determinative.") (emphasis in original).  Perhaps, most importantly, the Supreme Court held in *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010), that a defendant need not expressly waive her *Miranda* rights either orally or in writing because an implicit waiver is sufficient.  In so holding, the Supreme Court explained that "[t]he course of decisions since *Miranda*, informed by the application of *Miranda* warnings in the whole course of law enforcement, demonstrates that waivers can be established even absent formal or express statements of waiver that would be expected in, say, a judicial hearing to determine if a guilty plea has been properly entered." *Id*. at 383.  Thus, the fact that Bush did not sign a waiver of rights form is not dispositive and does not affect the undersigned's determination that her waiver was knowing, intelligent, and voluntary.

Thus, the government has established by a preponderance of the evidence that Bush knowingly and intelligently waived her *Miranda* rights.

## V.   Conclusion

For the reasons stated above, the undersigned RECOMMENDS that Bush's

motion to suppress, (ECF No. 34), be DENIED.

Dated: March 20, 2023                          s/Kimberly G. Altman
Detroit, Michigan                              KIMBERLY G. ALTMAN
                                               United States Magistrate Judge

## NOTICE TO PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation.  Any objections must be filed within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Isaac v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR

24

72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 20, 2023.

s/Carolyn M. Ciesla
CAROLYN M. CIESLA
Case Manager
